IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BEVERLY PERSKY, as Trustee under the | ) | |
| Beverly Persky Trust dated March 1, 1996, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 09 C 2614 |
| | ) | |
| WILLIAM BLAIR & COMPANY, a | ) | Hon. Charles R. Norgle |
| limited liability company, | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| Defendant. | ) | |

## AMENDED CLASS ACTION COMPLAINT

Beverly Persky, as Trustee under the Beverly Persky Trust dated March 1, 1996, states as

her Amended Class Action Complaint against defendant William Blair & Company, a limited

liability company, as follows:

## INTRODUCTION

1.      This is a class action on behalf of persons for whom William Blair & Company

("Blair") served as an investment advisor and maintained discretionary accounts through which

Blair purchased auction rate securities (also known as auction rate preferred stock, auction

market preferred stock, variable rate preferred securities, money market preferred securities,

periodic auction rate securities, and auction rate bonds).

2.      Auction rate securities were sold as a safe cash alternative to money market funds

or other highly liquid short-term investments but in fact:

1

(a)     auction rate securities were not cash alternatives, but instead were complex, long-term financial instruments with 30 year or longer maturity dates.

(b)     auction rate securities were only liquid at the time of sale and could quickly become illiquid if the broker-dealers stopped maintaining an auction market for the securities or the auctions for the securities failed; and

(c)     because of the liquidity and credit risks associated with auction rate securities, investments in these securities was appropriate only for other highly sophisticated institutional investors.

3.     On February 13, 2008, 87% of all auctions of auction rate securities failed when the major broker-dealers refused to continue to support the auction rate securities market.  As a result of the withdrawal of support by all the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of more than $300 billion in auction rate securities with no means of liquidating their investments.

4.     Blair purchased millions of dollars of auction rate securities for customers for whom it served as an investment advisor.  These investments are essentially worthless and may be currently sold, if at all, for pennies on the dollar.  Plaintiff, individually, and on behalf of all other similarly situated Blair customers, seeks to rescind Blair's purchase of any illiquid auction rate securities through their discretionary accounts, and/or to recover the lost value, interest and other damages suffered as a consequence of such purchases.

## **PARTIES**

5.     Plaintiff Beverly Persky, as trustee of the Beverly Persky Trust dated March 1, 1996, is a resident of Chicago, Illinois for whom Blair served as an investment advisor and

2

purchased auction rate securities through her discretionary account.

6.      Defendant Blair is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  Blair is in the business of, among other things, serving as an investment advisor for its customers.  One or more members of Blair are citizens of Illinois.

## CLASS ACTION ALLEGATIONS

7.      Plaintiff brings this action as a class action on behalf of all persons for whom Blair served as an investment advisor Blair and maintained a discretionary account through which it purchased auction rate securities and held such securities on or after February 13, 2008 (the "Class").  Plaintiff did not and does not bring this action on behalf of all persons who purchased auction rate securities through investment accounts maintained by Blair.

8.      Based upon the affidavit previously filed by Blair's General Counsel in this action, plaintiff is informed and believes that there are only 36 members of the Class.  Joinder of all members is impracticable.

9.      There are questions of fact or law common to the class.  These questions of fact and law include, but are not limited to:

(a)      whether auction rate securities were liquid and safe investments, or potentially illiquid, high risk investments

(b)      whether Blair breached its fiduciary duties by purchasing auction rate securities for its investment advisor customers;

(c)      whether Blair was acting in the best interests of its investment advisor customers when it purchased auction rate securities for them, or whether Blair was acting in its own self-interest when it made these purchases;

3

(d)      whether plaintiff and the members of the Class who continue to hold auction rate securities purchased by Blair should be permitted to rescind those purchases, or recover damages from Blair equal to the par value of those investments; and

(e)      whether Blair should disgorge and forfeit all commissions, fees or other compensation it received in connection with the purchase of auction rate securities for its investment advisor customers.

10.      Plaintiff's claims are typical of the claims of the Class;

11.      Plaintiff will fairly and adequately represent the Class.

12.      A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## **GENERAL ALLEGATIONS**

### **Background**

13.      The term "auction rate securities" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auction."  The auctions for auction rate securities were conducted on unregulated over-the-counter markets. Auction rate securities generally have long-term maturities, typically 30 years, and in the case of preferred shares, no maturity.

14.      Auction rate securities were auctioned at par value so the return on investment to the investor, and the cost of financing to the issuer of the securities, were determined by the interest rate or yield set through the auction.  Generally, auctions for auction rate securities were held every 7, 28 or 35 days.  The interest rate or yield on the securities was set or reset at each auction through a "Dutch Auction" bidding process.   At the end of the auction, the lowest rate at

which all of the shares of the securities available for sale at the auction could be sold uniformly was called the "clearing rate."  The clearing rate was then fixed as the interest rate which the securities issuer had to pay on the securities until the next auction was held.

15.     The broker-dealers who were underwriting auction rate securities and managing the auctions would often engage in a number of practices to support the auction process, including, submitting their own orders to purchase and sell the securities for their own account. This had the effect of maintaining liquidity at the auction by assuring that there were enough purchasers and sellers to have a successful auction.  The broker-dealers who underwrote and managed the auctions were under no obligation, however, to take any action to maintain liquidity at the auctions, or ensure that all shares of the securities offered for sale would be sold.

16.     If there were not enough orders to purchase all of the shares of the auction rate securities being sold at an auction, then an auction would "fail."  If the auction failed, then none of the current shareholders could sell their shares, and the interest rate on the outstanding securities was set at a "maximum rate" described by a formula, or tied to an reference rate.  The "maximum rate" for many auction rate securities were relatively low.  As a result, if an auction failed, owners of the auction rate securities were unable to sell their shares, and would receive only fixed minimal interest on their illiquid investments.

17.     Investments in auction rate securities were initially limited to qualified institutional investors who were required to make minimum investments of $250,000 or more. More recently, in an effort to market auction rate securities as widely as possible, investments were offered to members of the general public willing to invest a minimum of $25,000. Investments in auction rate securities were uniformly marketed to the public as safe, highly

5

liquid short-term investments, and as a safe alternative to money market funds, treasury bills, or cash.

18.     Although, on information and belief,  Blair was not a broker-dealer who underwrote and managed the auction of auction rate securities, as a participant in these markets it knew or should have known of the liquidity and credit risks inherent in auction rate securities, and should not have recommended or purchased such securities for its investment advisor customers.

### The Market for Auction Rate Securities Collapses

19.     In the summer of 2007, some auctions for auction rate securities backed by sub-prime mortgages failed.  In the fall-winter of 2007, more auctions began to fail.  However, Blair continued to purchase auction rate securities for their investment advisor clients.

20.     On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers refused to continue to support these markets.

21.     On February 14, 2008, it was disclosed that UBS, the second largest underwriter of auction rate securities, had decided to no longer support the auction market.  Virtually every other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided at or about the same time to withdraw their support for the auction market.  As a result of the withdrawal of all support of the major broker-dealers, the market for auction rate securities collapsed, rendering more than $300 billion of outstanding securities illiquid, and making it impossible for the holders of these securities, including Blair's investment advisor customers, to sell or liquidate their investments.

22.     Since the collapse of the auction rate securities market, many, but not all, firms

6

involved in the sale of auction rate securities to the public have offered to rescind their clients'

purchases, and refund the full purchase price, or make full restitution to investors who sold their

securities at less than par. Blair has not made such an offer. Instead, Blair has offered to loan

their clients' an amount equal to the par value of their clients' auction rate securities, but the

client must pledge other assets, other than the auction rate securities, as collateral for this loan.

## PLAINTIFF'S INVESTMENT IN AUCTION RATE SECURITIES

23.     Blair first purchased auction rate securities for plaintiff Beverly Persky shortly

after she retained Blair as her investment advisor in July, 2001.

24.     At the time plaintiff retained Blair to serve as her investment advisor, she was

required to execute an "Investment Advisory Agreement." A true and correct copy of the

Investment Advisory Agreement is attached hereto as Exhibit A. On information and belief, all

members of the Class executed similar Investment Advisory Agreements when they retained

Blair to manage their investments.

25.     The Investment Advisory Agreement ("Agreement") gives Blair complete

authority and power to manage and control the plaintiff's investments, and authorizes Blair, in its

sole discretion, to make investment decisions for its customer consistent with the customer's

investment objectives.

26.     Unlike a traditional investor, customers such as plaintiff , who retain Blair as an

investment advisor and grant it complete authority and discretion to manage their accounts, do

not make investments decisions for their accounts, and do not rely upon any particular

information provided to them by Blair in connection with the purchase of securities for their

account. Instead, such persons rely upon Blair's general knowledge and investment expertise,

and entrust and expect Blair to make investment decisions for them consistent with their

investment objectives. In fact, the Investment Advisory Agreement expressly states:

> "The Client hereby authorizes the Advisor [Blair] in its sole discretion and
>
> without prior consultation with the Client to make investment decisions for the
>
> Account and to execute such investment decisions, it being understood that the
>
> Advisor shall have complete discretion as to the nature, amount and timing of all
>
> transactions to be effected in the Account."

27. When the plaintiff retained Blair, she transferred her existing investments from

another broker which had been handling her account. At the time of the transfer, the plaintiff's

investments consisted of only safe and liquid fixed income assets (primarily municipal bonds) ,

as well as a small amount of cash. These fixed income investments were consistent with and

suitable for plaintiff's investment objectives, which remained the same throughout her

involvement with Blair.

28. From and after July 2001, Blair began purchasing increasing numbers of shares of

auction rate securities for plaintiff's account. In fact, from July, 2001 through February 2008,

Blair purchased thousands of shares of auction rate securities for her account. All of the shares

of auction rate securities which Blair purchased for plaintiff's account were issued by a single

issuer, Nuveen, rather than by a diversified number of issuers.

29. By January 31, 2007, Blair had purchased, and was holding in plaintiff's account,

a total of $5,975,000 auction rate securities. This represented almost 40% of the total assets in

the plaintiff's account. Blair continued to purchase auction rate securities even as the market for

these securities began to collapse in August, 2007. The last purchase Blair made for plaintiff's

account was on January 31, 2008, when Blair purchased $250,000 of Nuveen auction rate

securities. Within days, the auction rate security market completely collapsed.

30.     When the auction rate securities market collapsed in February, 2008, plaintiff was

holding $4,350,000 in auction rate securities. All of plaintiff's shares of auction rate securities

became instantly illiquid and plaintiff had no ability to sell them. Since the collapse of the

auction rate securities market in February, 2008, plaintiff has been able to redeem some of the

shares which Blair purchased for her through a redemption process initiated by the issuer of the

securities; however, plaintiff still currently holds $2,750,000 in shares of auction rate securities

which she cannot sell and which have little or no present value. In addition, the interest being

paid on these illiquid securities is substantially less than the interest plaintiff would have earned

had Blair continued to invest her assets in the type of safe and liquid fixed income securities in

which plaintiff was invested when she opened her account at Blair.

31.     On information and belief, when the auction rate securities market began to

collapse in late 2007, the members, principals, and other employees of Blair liquidated their

positions in auction rate securities. Blair took no steps, however, to liquidate plaintiff's and the

Class members' positions until after the market had effectively collapsed, when it was too late to

act and protect their interests.

### COUNT I
### ACTION FOR BREACH OF CONTRACT

32.     Plaintiff incorporates and realleges paragraphs 1 through 31 above as paragraph

32 of this Count I.

33.     Pursuant to the terms of its Investment Advisor Agreement and in its role as

plaintiff's and the Class members' investment advisor, Blair had a duty and obligation to make

and execute investment decisions consistent with the plaintiff's and Class members' investment objectives. Neither the plaintiff's nor any Class member's investment objective was to invest in illiquid and high risk securities.

34. Blair breached its duty and obligation under the Investment Advisor Agreement, and as plaintiff's and the Class members' investment advisor, by exercising its discretion and purchasing high risk and illiquid auction rate securities for the plaintiff's and Class member's accounts, and by continuing to invest and maintain positions in auction rate securities even as the market for these securities began to collapse.

35. As a direct and proximate result of Blair's breach of its obligations under the Agreement, and as plaintiff's and the Class members' investment advisor, plaintiffs have suffered damages, including the loss of the value and interest on their auction rate securities.

Wherefore, plaintiff prays that this matter be certified as a class action on behalf the Class defined herein, that judgment be entered in her favor and in favor of each member of the Class, and against defendant Blair, for compensatory damages in an amount equal to the amount paid for the illiquid auction rate securities purchased for their accounts, plus the interest lost on such investments and their costs of suit.

**COUNT II**
**ACTION FOR BREACH OF FIDUCIARY DUTIES**

36. Plaintiff incorporates and realleges paragraphs 1 through 35 above as paragraph 36 of this Count II.

37. As an investment advisor, with full authority and power to manage and control the plaintiff's and the Class member's investments, Blair served as a fiduciary for plaintiff and

the Class members and owed them the highest degree of fiduciary duty, fidelity, skill and care

under Illinois law.  Blair's fiduciary duties included, but were not limited to taking actions and

making investment decisions  which were prudent, fair and reasonable, and consistent with its

customer's investment objectives and risk tolerance.

       38.     Blair breached its fiduciary duties to plaintiff and the members of the Class in

numerous respects including, but not limited to:

       (a)     purchasing auction rate securities for the plaintiff's and Class members'

account and placing them at substantial risk when Blair knew, or should have known, that

auction rate securities were not safe, liquid, cash alternatives, but instead were complex, long-

term financial instruments with 30 year or longer maturity dates;

       (b)     purchasing auction rate securities for plaintiff's and the Class members'

account and placing them at substantial risk when Blair knew, or should have known, that

auction rate securities were only liquid at the time of sale, and would  become illiquid if the

auction market for the securities failed;

       (c)     purchasing auction rate securities for plaintiff's and the Class members'

account and placing them at substantial risk when Blair knew, or should have known, that if the

auctions for the auction rate securities Blair purchased for their account failed ,and the securities

became illiquid, their customers would be unable to sell the securities, and would receive only a

fixed maximum interest rate which may be below market rates, indefinitely or until the securities

matured 30 or more years later; and

       (d)     maintaining plaintiff's and the Class members' position in auction rate

securities when it knew that the market for such securities was failing, and when its members

and employees were taking action to sell their positions to protect their own individual interests.

39.    As the direct and proximate result of Blair's breach of its fiduciary duties, plaintiff and the members of the Class have been injured.

40.    As a consequence of Blair's breach of fiduciary duty, plaintiff and the members of the class should be permitted to rescind their purchase of all shares of auction rate securities which they currently hold or, alternatively, recover damages from Blair in an amount equal to the full par value of the auction rate securities.  Plaintiffs and the members of the Class should also be permitted to recover the interest they lost on these investments.  Any Class member who sold their auction rate securities at less than par should be permitted to recover from Blair full restitution for any loss they suffered, including any interest they lost on the investments.

41.    In addition, Blair should be ordered to disgorge and forfeit the full amount of all fees, commissions or other compensation it earned on the purchase of auction rate securities for the plaintiff and each Class members, and disgorge and forfeit any management fees it charged plaintiff and the Class members during the period when it was breaching its fiduciary duties by purchasing auction rate securities for their account.

Wherefore, plaintiff prays that this matter be certified as a class action on behalf the Class defined herein, that judgment be entered in her favor and in favor of the Class, and against defendant Blair, and that the Court:

A.    Order Blair to rescind the purchase of all auction rate securities made for and currently held in the plaintiff's and Class members' accounts, and refund to the plaintiff and Class members the full amount paid for such securities;

B.    Alternatively, order Blair to pay plaintiff and each member of the Class damages

in an amount equal to the full par value of the auction rate securities which Blair purchased and are currently held in their accounts;

C.  Order Blair to provide full restitution to any Class member who sold their auction rate securities at less than par;

D.  Order Blair to pay plaintiff and the members of the Class as damages the amount of interest they have lost on their auction rate securities;

E.  Order Blair to disgorge and forfeit to plaintiff and the members of the Class all fees, commissions or other compensation it received in connection with the purchase of auction rate securities for their account;

F.  Order Blair to disgorge and forfeit the management fees it charged plaintiff and the members of the Class during the period when Blair was breaching its fiduciary duties; and

G.  Grant such other and further relief as the Court deems just.


PLAINTIFF DEMANDS TRIAL BY JURY.


BEVERLY PERSKY, as Trustee under the Beverly Persky Trust dated Mach 1, 1996, individually and on behalf of all others similarly situated,

By: /s/  Claire E. Gorman
One of her attorneys

Michael H. Moirano
Claire E. Gorman
NISEN & ELLIOTT, LLC
200 West Adams Street
Suite 2500

13

Chicago, Illinois 60606
(312) 346-7800

14